IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GREGORY BARNES WATSON,

Petitioner,

vs.

M. MARTELL, Warden (A), Mule Creek
State Prison,

Respondent.

No. 2:09-cv-00358-JKS

MEMORANDUM DECISION

Petitioner Gregory Barnes Watson, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254 challenging the action of the California Board of Prison Hearings ("Board") in denying him parole. Watson is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Mule Creek State Prison. The Respondent ("State") has answered, and Watson has replied. At Docket No. 29, Watson's father, Byrn A. Watson, has filed a motion requesting permission to file an *amicus* brief in support of Watson's Petition. Respondent has not opposed the motion. Watson has also requested an evidentiary hearing.

I. PENDING MOTIONS

**A.    Evidentiary Hearing**

Ordinarily, a federal habeas proceeding is decided on the complete state-court record and a federal evidentiary hearing is required only if the trier of fact in the state proceeding has not

developed the relevant facts after a full hearing.[1]  It does not appear from the record that the

California courts made any independent evidentiary findings, and review in this case is based

upon the findings of the Board, which did hold a full hearing developing the facts.  Watson has

not identified any factual conflict that would require this Court to hold an evidentiary hearing to

resolve.  The request for an evidentiary hearing is, therefore, DENIED.

**B.      Amicus Brief**

In his proposed *amicus* brief, Watson's father, Byrn A. Watson, requests that this Court

re-weigh the evidence and substitute its judgment for that of the Board.  This, as is more fully

explained below, the Court may not do.  Accordingly, the motion for leave to file an *amicus* brief

at Docket No. 29 is DENIED.

## II.  BACKGROUND/PRIOR PROCEEDINGS

In September 1987, following a trial by jury, Watson was convicted in the Ventura

County Superior Court of one count of Murder in the First Degree (Cal. Penal Code § 187) and

two counts of Assault with a Deadly Weapon (Cal. Penal Code § 245(a)(2)), with a finding of

true as to the allegations of Use of a Firearm (Cal. Penal Code § 12022.7) as to the murder and

one assault conviction, and Great Bodily Injury (Cal. Penal Code § 12022.7) as to the other

assault conviction.  The trial court sentenced Watson to an aggregate, indeterminate prison term

of 34 years to life.  Watson does not challenge his conviction or sentence in this proceeding.

In July 2007 Watson, whose Minimum Parole Eligibility Date was July 10, 2008, made

his first parole-suitability appearance before the California Board of Parole Hearings.  The Board

---

[1] *Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds* by *Keeny v. Tamayo-Keyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

2

found Watson unsuitable for parole and denied him parole for a period of four years.  Watson timely sought habeas relief in the Ventura County Superior Court, which denied his petition in an unpublished, reasoned decision.  Watson's subsequent petition for habeas relief in the California Court of Appeal, Second Appellate District, was summarily denied without opinion or citation to authority.  The California Supreme Court also summarily denied Watson's petition for habeas relief without opinion or citation to authority on December 17, 2008.  Watson timely filed his Petition for relief in this Court on January 26, 2009.

After briefing was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[2]  At Docket No. 25 this Court entered an Order directing the parties to file supplemental briefs addressing the *Hayward* decision, which understood that California law created a liberty interest in each prisoner that he or she would be paroled unless the parole authority found that the prisoner presents a current danger to the community.  In particular, this Court directed that the State address the *Hayward* holding that under California law "[t]he prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state supports the inference of dangerousness.'"[3]  The Court also directed the parties to consider two Ninth Circuit Decisions applying *Hayward*.[4]  Both parties have submitted supplemental briefing.

---

[2] 603 F.3d 546 (9th Cir. 2010) (en banc).

[3] *Hayward*, 603 F.3d at 562.

[4] *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam) and *Cooke v. Solis*, 606 F.3d 1206 (9th Cir. 2010).

The facts of the underlying commitment offense, as summarized by the California Court of Appeal on direct appeal and quoted in part by the Board, are:

FACTS

*The Prosecution's Case*

Marlen Gonzalez lived with her boyfriend, Jose Salinas, at the Simi Valley home of Hope Rodriguez. They were all home on the afternoon of November 10, 1986, when Watson came to see Rodriguez.

Gonzalez testified that Watson, Rodriguez and Salinas were in the dining room. She was in the kitchen preparing lunch when she heard a noise. She turned and saw Watson shooting Rodriguez. Watson then pointed the gun at the head of Gonzalez' young daughter. Gonzalez screamed, and Watson shot at her but missed. Watson fled out the door. At trial Gonzalez identified a grey sweatshirt with a red circular design as the one worn by Watson at the time of the shooting. The day after the shooting someone brought the sweatshirt to the cleaners.

Salinas testified at the preliminary hearing that Watson and Rodriguez were talking about money, and that Watson wrote something down on a piece of paper. Salinas left the dining room to go to the bathroom when he heard a shot. He turned and saw Watson shooting Rodriguez. Watson then shot Salinas twice, hitting him in the side and the throat. Salinas, despite his injuries, ran to his bedroom, got a revolver, and shot at Watson through a window as Watson ran to a yellow mini truck. Watson drove away and Salinas then called the police.

Later, while in a hospital emergency room, Salinas told police that a man named Greg, whom he had met before, was the assailant. (This was Watson.) The day after the shooting, Gonzalez also identified Watson as the gunman. A piece of paper with words on it written by Watson was found in the Rodriguez living room.

Marc Holmes, Watson's employer, testified under a grant of limited immunity as follows: Holmes, Rodriguez, Salinas and others attended a meeting at Rodriguez' home in late October 1986. Several of those attending were later arrested for possession of cocaine. Rodriguez was frightened after this drug arrest, and asked Holmes for his help in leaving the country. Holmes had planned to meet with Rodriguez early in the day of the shooting, but Salinas called him before lunch to postpone the time of the meeting. Sometime after 1 p.m. Rodriguez called Holmes and asked him for help in hiding her automobiles. A little while later, Watson called and told Holmes that he had driven by Rodriguez' house, and that it was surrounded by police. Holmes said he thought Rodriguez had been arrested for cocaine. Concerned that they might be vulnerable to arrest, Watson and Holmes met that afternoon and disposed of drug paraphernalia. Holmes provided police with the cleaner's ticket for the grey sweatshirt worn by the gunman.

4

Matthew Talbert, an acquaintance of Holmes and Watson, testified that Holmes told him that Watson admitted killing Rodriguez, and that Holmes and Watson disposed of the gun together.

*The Defense Case*

Officer John Samarin of the Simi Valley Police Department was the first police officer at the scene.  Samarin testified that he questioned Salinas and Gonzalez separately, and that they both described the assailant as a white male between 20 and 30 years old, 5 foot 6 to 7 inches tall, and slender build.  Both Salinas and Gonzalez repeatedly told Samarin that they did not know the identity of the shooter. Gonzalez described him as clean shaven. In fact, Watson is six feet tall and wore a moustache at the time of the shootings.

Salinas did not tell Officer Samarin that he had a gun and fired back at the assailant.  Gonzalez testified that she did not know the name of the gunman and did not remember she had previously met him until she spoke with Salinas on the day after the shootings.

Los Angeles Police Department Detective Ramon Madrid testified that several days before the shooting he took part in a drug raid where nine persons were arrested and 95 kilograms of cocaine seized. During the raid the detective found notes with Hope Rodriguez' telephone number.

Holmes denied telling Talbert that Watson admitted killing Rodriguez or that they disposed of the murder weapon together.[5]

Although Watson had not previously given a statement describing his version of the facts

of the underlying crime, at the parole-suitability hearing he made the following statement:

**PRESIDING COMMISSIONER MARTINEZ**:  And now, let's go back a little bit, what was the reason that you were at the residence of Ms. Rodriguez?

**INMATE WATSON**:  On that morning my employer, Mr. Holmes, had asked me to collect money that was owed to Mrs. Rodriguez.  He told me to meet him out at Mrs. Rodriguez' home, to meet him at Mrs. Rodriguez' home at a specific time to give her the money that was owed to her.

**PRESIDING COMMISSIONER MARTINEZ**:  So you were instructed by Mr. Holmes to go to the residence?

**INMATE WATSON**:  Yes, to meet him at the residence.

**PRESIDING COMMISSIONER MARTINEZ**:  To meet him at the residence, and the reason for it was to give her money.

**INMATE WATSON**:  Yes.

**PRESIDING COMMISSIONER MARTINEZ**:  -- that was owed to her?

---

[5] *People v. Watson*, 261 Cal. Rptr. 635, 636-37 (Cal. App. 1989).  The prosecution's case is the only part quoted by the Board.  Docket No. 22-2, pp. 32-35.

**INMATE WATSON:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** So did you have money to give her?

**INMATE WATSON:** Yes.

**PRESIDING COMMISSIONER MARTINEZ:** What was that amount?

**INMATE WATSON:** $20,000.

**PRESIDING COMMISSIONER MARTINEZ:** And this money that was owed, the $20,000, what was the circumstances to be there?

**INMATE WATSON:** I learned from Mr. Holmes that Mrs. Rodriguez had given him a large quantity of cocaine to sell to purchase a home that he and I were both going to be living in, and then we were going to keep the home for investment purposes. And so she was giving him the money -- excuse me, giving him the drugs up front to sell, and she was going to be, not a silent investor, but just giving him the drugs up front to pay for the whole house in advance.

**PRESIDING COMMISSIONER MARTINEZ:** So you get there.

**INMATE WATSON:** So I show up at the time that I'm supposed to. I waited out front, and Mr. Holmes never showed up. So I waited about five to ten minutes, and decided, well, I'll just give her the money like I had a couple times in the past. I go to the door and knock, hand it to her and I leave. At that point she opened the door. She was talking on the phone, so she motioned me into the kitchen. There I was met by Mr. Salinas who brought me into the living room area, and basically said wait until Mrs. Rodriguez is off the phone, and did I bring the money? I said, yes, I've got it right here. And so we talked just for a few minutes. It was about ten minutes I believe, she came into the living room. She asked for the money. I gave it to her. I expected at that point I would just leave as I had done in the past. She counted the money. She said, well, where's the rest of it? At that point I was a little confused because I was told by Mr. Holmes to bring the money that was in the safe, and I said, well, that's all that I was told to bring. And she said, well, that's not Mark had told her the previous week, or that morning on the phone. I said, well, I don't know anything about that. I was just told to bring this to you. So she said, well, where is Mark? He was the one that was supposed to be here. I said again, he said to meet me here. Here I am. I don't know where Mark is. She said, well, try and call him. So I go use the phone in the kitchen, because there wasn't any living room, called the business. I called his cell phone. I called his pager. There was no answer. So I went back in the living room and I said, well, I don't know where Mark is. So Mrs. Rodriguez started asking me, well, what escrow company are you guys using? And I told her, well, it was Pinnacle Escrow. It's in Reseda. And at this point I'm a little confused because I thought that she already had all this information. I said, well, I'll write it down for you if you need me to. So Mr. Salinas gets up. He gets me something to write with and something to write on. As I'm doing so then Mrs. Rodriguez and Mr. Salinas move into the dining room area. I'm starting to write this down, and I'm looking at her expressions, and I'm thinking there's something that's not right

here because just bringing the money, as I've done in the past, and why is she so upset?  When I get upset I usually have to use the restroom because I have kind of a bladder problem.  And so when I was done I asked her if I could use the restroom.  She said, yeah, it back through the doors. So as I went by her I was trying to think of something, you know, ease her fears or her concerns, and I said I'm sure everything is going be all right.  Didn't Mark tell you Friday that things are okay?  She kind of nodded, and so I went to use the restroom.  I was trying to stall for time because I'm thinking, well, Mark has got to show up. Why would he tell me to meet him here if he wasn't going to show up?  And, again, I was just -- I didn't understand why she kept grilling me about the escrow company, and was the money placed in the escrow company.  I was telling her yes.  So finally I left the bathroom, came back out, and I asked her the question, I said, well, why do you need -- why are you asking me about the escrow company?  You know where it is. Mark told me a week and a half ago approximately to get the money that was out of there because he said he was giving that to you.  And at this point she's got this look on her face, and she turns to Salinas and says, take him out back and kill him.  And I'm just like -- it's like a movie, and it's like what is she saying?  Why would she say that?  I mean this had got to be a joke, right?  And I look at Mr. Salinas and at that point he just reaches for the gun that was in his waistband and he starts standing up, and I just ran as fast as I could.  And I was just get out of the house is all I could think about, and I ran to the front door, which was locked, couldn't get out.  And so I'm thinking to myself I'm trapped.  There's no way I can get out of here.  And so I know he's coming at me, so I pulled out the gun that I was carrying.  And as I was running past the dining room area I see him coming around behind Mrs. Rodriguez, and so I just start pulling the trigger as fast I could, thinking if I could just get him to get away from me I could get out of the house.  And at ·that point I hear this woman screaming in the kitchen, and I turn in the direction that I was going, and she's standing there with a knife.  Now she's blocking my exit.  How am I going to get out of here?  And so as I was running toward her I turned the gun and fired in her direction so she would just get out of my way.  And thankfully she backed up and crouched down, and basically I could run out the back door and get away.  And at this point I started hearing gunshots from Mr. Salinas, and so I know, you know, I'm a dead man.  I mean he's coming after me.  I jump in my truck, and I get out of there as fast as I could.  And I'm thinking, my gosh, he's chasing me.  There's no way that I can outrun his car, because I just got an old truck.  I mean it was nice, but it was still old.  And I'm thinking I've got a four-wheel drive right in the Simi Valley area.  I can get to the hills that are close by, and then I can go off road.  And so I'm looking in my rearview mirror and I didn't see, so I'm thinking, okay, well, maybe he's not chasing me.  So I keep looking and looking, and I don't see anybody.  So I finally -- I said, okay, I've got to calm down. I've got to calm down, because I mean I can barely drive this thing.  I pullover, and I keep looking.  I don't see anybody.  I say, okay, my gosh, he's not after me, but what if he just went straight back to the

business thinking that that's the direction I went, or maybe he's going after Mark. I don't know.  So I try my cell phone.  I can't get any signals.  I'm thinking, okay, what do I do?  What do I do? So I think, okay, I've got to find a payphone.  So I basically start driving around and I found a payphone, and I call Mark and I said, look, they're after us.  I said -- He said, well, what's going on?  And I explained they tried to kill me.  He says, well, are you all right?  I said, well, yeah, but they were shooting.  And he says, well, is anybody shot?  I said, well, I don't think so because he keeps shooting at me.  So I mean you've got to get out of there.  And so basically he told me to meet him at Chatsworth Park, and that's where we met that afternoon to discuss what to do.

[Testimony concerning what occurred after Watson left the scene of the crime is omitted]

      **DEPUTY COMMISSIONER SMITH:**  I'm going to make one comment, and it is an advisory comment.  I know Mr. Sanders represents other individuals at these consideration hearings, and that he realizes that, as well as this Panel does, that one of the important factors in an initial hearing, and the real need that everything that's said be truthful and accurate is that it sets the foundation should there be any subsequent hearing.  And that if an individual makes statements at an initial hearing, and then recants those statements at a later hearing, it actually does them no good.  Based on the statements you've made regarding the event, which we'll explore in some detail, the question I have is whether or not counsel wishes to take a short recess and discuss your version prior to us going forward?

      **ATTORNEY SANDERS:**  Commissioner, this is something we've already discussed, and my client and I talked about what happened at his trial and what's happening now, and this is what my client wants to do is tell the truth, and even though it may be contradictory to some of the things that has been said by the counselor, and some of the points the probation report.  He assured me what he's saying is the truth and he wishes to continue.

      **DEPUTY COMMISSIONER SMITH:**  Okay. Then he'll do so.  All right.

[Additional testimony concerning Watson's actions after leaving the scene of the crime is omitted.]

      **PRESIDING COMMISSIONER MARTINEZ:**  Well, again, (inaudible) indicated that certainly there is quite a bit (inaudible) as to what you're presenting here today to this Panel in reference to what happened.  Again, we have to look at the evidence before us (inaudible) read so far in the Appellate Opinion and on the probation officer's report, and it certainly does go into more detail in reference to witness statements and people that were there, testified in reference to this.  Did you -- Were you convicted by a jury?

      **INMATE WATSON:**  Yes, I was.

      **PRESIDING COMMISSIONER MARTINEZ:**  And, again, there seems to be some discrepancies as to how well you knew these individuals it

appears based on the statements that you're very familiar with them, that you actually felt very comfortable.  That you had walked in at times and opened up the refrigerator, and help yourself and, again, that you seemed pretty comfortable.  That you actually referred to Ms. Rodriguez as mom, again noting one particular time during this prior to the shooting that you leaned over and kissed her, and said something to the effects [*sic*] of it's going to be all right, mom, and then went (inaudible).  And are you stating that did not occur?

     **INMATE WATSON:**  Correct.

     **PRESIDING COMMISSIONER MARTINEZ:**  Okay. And in reference to you coming back, and I guess it's still not very clear because there is no evidence to show us as to what exactly happened at that time, other than Mr. Salinas and the female victim in this case, Ms. Gonzales heard shots.  And, again, the question that arises in my eyes is that Ms. Rodriguez was sitting in the chair with a gunshot to her head.  Mr. Salinas also received gunshot wounds, again, to the chin, I believe, area, of the torso area.  So certainly that's something that, even in your description here today, you somewhat have been very vague as to how that happened.

     **INMATE WATSON:**  I don't -- When I was moving from the front door, which was locked, past the dining room, I was shooting as fast as I could, trying to get away, and  was not pointing directly at any person, but just in the general direction.  And so that is how both -- That is how Mrs. Rodriguez was killed, and Mr. Salinas was severely injured.

     **PRESIDING COMMISSIONER MARTINEZ:**  Why is it that you had a gun in the first place?

     **INMATE WATSON:**  Whenever I was either depositing money from Sound Moves into the bank, or carrying money to Mrs. Rodriguez, I would carry a gun for protection.

**PRESIDING COMMISSIONER MARTINEZ:**  Dealing in drugs, drug trafficking?

     **INMATE WATSON:**  Yes, sir.

[Testimony concerning details of the drug dealing business omitted]

     **PRESIDING COMMISSIONER MARTINEZ:**  And in your  trial, and even in when you met with the probation officer, you never did provide a statement, did you?

     **INMATE WATSON:**  No, sir. My attorney, Mr. Ash, and my subsequent _

     **PRESIDING COMMISSIONER MARTINEZ:**  This is pretty much our first opportunity here you providing a statement to your responsibility and your involvement in this case?

     **INMATE WATSON:** Yes, sir.

     **PRESIDING COMMISSIONER MARTINEZ:**  Well, again, that certainly does raise an issue in reference to your version as opposed to the victims that survived in the end, and talking again with Ms. Gonzales' statements about

you pointing a gun at her, and then pointing at her child before leaving.  Certainly at this point in time you're indicating that that's not true.

**INMATE WATSON:**  I believe it was true because I  would not contradict her in any way.  What I was trying to say is that I have no intention to point the gun at any specific person.  It was just as I was moving my arm that was holding the gun it probably pointed at these individuals, because the end result was that Mrs. Rodriguez was killed.  That's absolutely my fault.  Mr. Salinas was terribly injured.  That is my doing.  And scared Mrs. Gonzales out of her wits thinking that I would in any way harm her or her child.  So I would not ever contradict her statement.  I'm just trying to explain to you what my actions were in moving through the room.  It was not intended to point specifically at a person, but it was simply to cause Mr. Salinas not to shoot at me, or to take me out back and try to kill me.  So I will not refute her statements from what she saw, no.

**PRESIDING COMMISSIONER MARTINEZ:**  Would you refute her statements about that she was the one that opened the door and let you in?

**INMATE WATSON:**  Yes.  Mrs. Rodriguez is the one that opened the door and let me in, because the phone she was using is situated right next to that door.

**PRESIDING COMMISSIONER MARTINEZ:**  All right.  Let's move on.  We'll probably come back and revisit this a little bit more.

**DEPUTY COMMISSIONER SMITH:**  Commissioner, if we may, before we go into the background, since we're talking about the commitment offense at this time I'd like to -- with your concurrence I'd like to jump ahead and ask a few questions of my own while it's fresh.

**PRESIDING COMMISSIONER MARTINEZ:**  Sure.

**DEPUTY COMMISSIONER SMITH:**  Mr. Watson, correct me if I'm wrong, but you were an employee and a partnership of this other individual who was involved in a major drug business?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  And that you had gone to the Rodriguez' home with money to return to her?

**INMATE WATSON:**  Correct.

**DEPUTY COMMISSIONER SMITH:**  And there was some discussion or argument with regard to the amount of money.  She was expecting a larger amount to be returned.

**INMATE WATSON:**  Correct.

**DEPUTY COMMISSIONER SMITH:**  And at that time she told Mr. Salinas to take you into the back and kill you?

**INMATE WATSON:**  No, prior to that she asked me to try to get a hold of Mr. Holmes.

**DEPUTY COMMISSIONER SMITH:**  And that being unsuccessful--

10

**INMATE WATSON:**  That being unsuccessful.  And then after I used the restroom -- I can't think for her, but from what I believe went on is that her belief was that no money had ever been removed from --

**DEPUTY COMMISSIONER SMITH:**  I'm not --

**INMATE WATSON:**  Okay.  I'm sorry.

**DEPUTY COMMISSIONER SMITH:**  Okay. I'm looking at the steps of what took place.

**INMATE WATSON:**  Okay.

**DEPUTY COMMISSIONER SMITH:**  So you went to the restroom and you came back out, and at that time you indicate you told us that Mr. Salinas was armed.

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  And he was going to take you out in the back.

**INMATE WATSON:**  Not until I had asked her about why she was concerned about the escrow money, because I believe that she had already asked Mr. Holmes --

**DEPUTY COMMISSIONER SMITH:**  So then Mr. Salinas was going to take you out in the back?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  And you became fearful at that point?

**INMATE WATSON:**  Absolutely.

**DEPUTY COMMISSIONER SMITH:**  And then what did you do?

**INMATE WATSON:**  Then I ran to the front door.

**DEPUTY COMMISSIONER SMITH:**  Okay.

**INMATE WATSON:**  And attempted to get out of the house. I wasn't able to because the door was locked, and so in panicking, knowing that he's coming around that corner any second I pulled my gun out and ran past, pulling the trigger as fast as I could.

**DEPUTY COMMISSIONER SMITH:**  You ran past what?

**INMATE WATSON:**  The dining alcove area where Mrs. Rodriguez was sitting, and where Mr. Salinas was coming from behind.

**DEPUTY COMMISSIONER SMITH:**  Okay. And you pulled the trigger as fast as you could?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  How many times?

**INMATE WATSON:**  I believe until the gun was empty.

**DEPUTY COMMISSIONER SMITH:**  What kind of gun was it?

**INMATE WATSON:**  It was German Ruger -- a Luger, excuse me, Luger.

**DEPUTY COMMISSIONER SMITH:**  How many rounds did it have?

11

**INMATE WATSON:**  I do not recall, ten possibly. I don't remember at this time.

**DEPUTY COMMISSIONER SMITH:**  And when you were firing all those rounds were you simply spraying the room?  Was there -- Since you knew Mr. Salinas was armed were you attempting to shoot Mr. Salinas?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  Did you see Mr. Salinas?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  So you shot in Mr. Salinas' direction.

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  And where was Ms. Rodriguez at the time you were shooting at  Mr. Salinas?

**INMATE WATSON:**  Mr. Salinas was moving behind Mrs. Rodriguez coming in my direction.  So he was essentially right behind her as I entered the area where I could actually see him.

**DEPUTY COMMISSIONER SMITH:**  Okay. If she's sitting down, and he moves behind her, how does that translate into him moving toward you?

**INMATE WATSON:**  Because she's sitting at the corner of what would be considered a four seat like a dining table, and so he's moving around her towards me.  So she's at the corner, and coming behind her, he's moving toward me.

**DEPUTY COMMISSIONER SMITH:**  So you're indicating that you shot Mrs. Rodriguez first?

**INMATE WATSON:**  I don't know whom I shot first.  As I was raising the gun I was just pulling the trigger.  I was not intending in my mind to shoot any person first, second or at all, though that would be the consequences of shooting period.  But it was just to stop him from coming at me.

**DEPUTY COMMISSIONER SMITH:**  And she was sitting in the living room?

**INMATE WATSON:**  She was sitting at the dining room table.

**DEPUTY COMMISSIONER SMITH:**  Dining room table.  The dining room table was in the kitchen, or was it separate?

**INMATE WATSON:**  It's a separate room.

**DEPUTY COMMISSIONER SMITH:**  So Ms. Rodriguez is sitting in a chair.

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  Mr. Salinas is standing behind her when you open up and empty your gun?

**INMATE WATSON:**  Correct, not quite emptied it because when I heard -- I just want to make it clear that when I heard the woman in the kitchen screaming there was still bullets left to shoot at her. I didn't want you to be

12

confused that I -- when I said I just emptied the whole gun that all the bullets went in the direction of Mr. Salinas or Mrs. Rodriguez, because --

**DEPUTY COMMISSIONER SMITH:**  So you didn't -- because I asked if you --

**INMATE WATSON:**  But that's why I wanted to clarify.

**DEPUTY COMMISSIONER SMITH:**  So you still had some rounds left in the gun?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  Okay.

**INMATE WATSON:**  But I wasn't as I wasn't counting bullets or anything like that.  I was just pulling the trigger.

**DEPUTY COMMISSIONER SMITH:**  Now, did Mr. Salinas, was he armed through this entire event?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  Or did he go arm himself later?

**INMATE WATSON:**  No, he was armed the entire time.

**DEPUTY COMMISSIONER SMITH:**  And he was shot in the dining room?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  Not in the kitchen?

**INMATE WATSON:**  No.

**DEPUTY COMMISSIONER SMITH:**  Did he ever fire his weapon?

**INMATE WATSON:**  Yes, he did.

**DEPUTY COMMISSIONER SMITH:**  How many times did he fire his weapon?

**INMATE WATSON:**  I don't know exactly.

**DEPUTY COMMISSIONER SMITH:**  Best guess.

**INMATE WATSON:**  Three, four times.

**DEPUTY COMMISSIONER SMITH:**  Always in your direction?

**INMATE WATSON:**  Yes.

**DEPUTY COMMISSIONER SMITH:**  There was a two-year-old, did you ever point your weapon at the two-year-old?

**INMATE WATSON:**  Not purposely, but as Mrs. Gonzales said, she saw me do so. And as I was turning my gun from the direction of Mr. Salinas and Mrs. Rodriguez she said I did.  I don't in any way intended it for it to be so.  But if she said that as I was turning the gun it was pointed at the girl, little girl --

**DEPUTY COMMISSIONER SMITH:**  Well, actually that isn't what she said.  She said that you pointed the weapon at the head of the little girl and held it on the little girl for some period of time.

**INMATE WATSON:**  No, that's not what I did.  No, sir.

**DEPUTY COMMISSIONER SMITH:**  So that's not correct?

13

**INMATE WATSON:**  That's not correct.  But as I said, I would not argue the point of what she saw because I'm not in her eyes.  I only know what I was doing at the time.

**DEPUTY COMMISSIONER SMITH:**  Now, does it surprise you that, at least according to the documents we have before us, of the rounds that were fired that were recovered that they were all yours?

**INMATE WATSON:**  No, not at all.

**DEPUTY COMMISSIONER SMITH:**  Well, how would you explain, as you've told us, that Mr. Salinas fired at you on a number of occasions, that none of those extended [*sic*] rounds were recovered in the residence?

**INMATE WATSON:**  Because he was shooting out the window at me as I was attempting to get into my vehicle.

**PRESIDING COMMISSIONER MARTINEZ:**  Well, based on that statement, from what I gather, that's not what you just told us (inaudible).

**INMATE WATSON:**  No.

**PRESIDING COMMISSIONER MARTINEZ:**  You mentioned that he shot at you while you were inside the residence.

**INMATE WATSON:**  No.

**PRESIDING COMMISSIONER MARTINEZ:**  And you're trying to get out.

**INMATE WATSON:**  No, that's not what I said.  I said -- The question that was asked was did Mr. Salinas ever shoot at you? And my answer was, yes, he shot several times.

**DEPUTY COMMISSIONER SMITH:**  And that was after you had shot him then?

**INMATE WATSON:**  Yes.[6]

### III.  GROUNDS RAISED/DEFENSES

Although Watson lists several bases, distilled to its essence, Watson's Petition raises but a single ground: that the evidence presented to the Board does not support a finding that he is unsuitable for parole.  Respondent does not assert any affirmative defense.[7]

### IV.  DISCUSSION

In its decision finding Watson unsuitable for parole, the Board held:

---

[6] Docket No. 22-1, pp. 36-59.

[7] *See* Rules—Section 2254 Cases, Rule 5(b).

**Presiding Commissioner Martinez:**  [. . . .]  The Panel makes the following findings:  That the prisoner needs better self-help in order to understand and cope, again, with the underlying causes of the life crime.  I think that in here today he certainly came across with a version that is new that's been presented by you in reference to how this occurred, and the reasons why this occurred.  And, again, frankly as I indicated earlier, this Panel again has to look at what is presented, what we have as far as evidence and facts, and I tend to look at in a different light in reference to how this occurred and what your responsibility was.  I feel that there was a lack of display of remorse here today by you.  I think that it's somewhat difficult to determine whether you're sorry because you're in this institution, you're in prison, or whether you're sorry because of what you did.  You certainly did not display and go into any detail in reference to how this impacted the family of these individuals, Ms. Rodriguez, her daughter.  And, again, we read and made statements about you and how, you know, obviously they portrayed a different version as to your familiarity with Ms. Rodriguez, and obviously you felt that comfortable, you as well as Mr. Holmes, in addressing her as mom and corning in as you please, and opening up the refrigerator and grabbing food, and felt very comfortable there at the residence.  So certainly a different picture has been laid out there in reference to you and your friend, employer, Mr. Holmes.  So, again, this Panel feels that until progress is made in these areas that the prisoner does continue to be unpredictable and a threat to others.  [. . . .]  We find that you have very limited gains since you have been here in the institution.  You've demonstrated you do need to demonstrate an ability to maintain gains over an extended period of time.  [. . . .]  The specific reasons for these findings are as follows:  The prisoner did commit this offense in a cruel, very callous manner.  This involved the inmate on November 10th, of 1986 going over to the victim's residence, Hope Rodriguez, and getting involved in a situation where, again, it was either money that was going to be paid to the victim, or whether this was in reference to a drug situation, again, unclear. However, what ended up happening is certainly, and that is that the inmate did shoot Ms. Rodriguez twice, once in the chest and once in the head, and then proceeded to shoot Mr. Jose Salinas as well in the chin.  Then before leaving sometime throughout this whole ordeal, Mr. Watson also pointed the weapon at a two-year old child, and also at the mother, traumatizing her and also, again, shooting at her twice, but missing.  Certainly there was a potential there for many more victims to be injured or killed in the same incident.  Certainly this particular child who had done nothing to you was vulnerable in the sense she could have lost her life in regards to your actions.  And, again, noting that this offense was carried out in a matter which demonstrates an exceptionally callous disregard for human life, the life of Hope Rodriguez, and obviously the suffering of the mother of this two-year-old child, and Mr. Jose Salinas.  We note, again, the psychological evaluation by Dr. Weber is very supportive in reference to both risk for assessment of dangerousness, but this Panel does feel that the inmate does need a longer period

of observation and evaluation before this Panel does give this inmate a grant.  The prisoner has not completed the necessary programming, which is essential to your adjustment.  You need additional time to gain such further programming.  We do recommend that you remain disciplinary-free, and that you avail yourself to further self-help, as well as, again, encourage you to obtain a vocation, and also noting that we are going to request a new psychological evaluation to be done for your next hearing.  With that being said -- Well, again, that will conclude this portion, my reading of the decision. I'm going to turn it over to Commissioner Smith for any further comments that he may have.

        **DEPUTY COMMISSIONER SMITH:**  Only to say that I concur with the comments you have made, and I have no comments to add.  Mr. Sanders, thank you very much.  And, Mr. Watson, good luck to you.[8]

Watson contends that these findings are insufficient evidence of current dangerousness.

In denying Watson's petition, the Ventura County Superior Court held:

> Upon consideration of the totality of the record presented by both parties in this case it cannot be said that there is no reliable evidence that the petitioner is a current danger to the community.
> It cannot, therefore, be said that the Board's decision was unlawful or that it was based on unconstitutional grounds.
> The Petition is therefore DENIED for failure to state a prima facie case supporting petitioner's release, pursuant to Rule 4.551.[9]

In the Order requesting supplemental briefing, this Court directed the State to "specifically identify those characteristics, other than the underlying commitment offense, that support a finding that release of the Petitioner to parole status poses a current threat to public safety, and point to the specific evidence in the record that supports that determination."  In order to preserve the issues for appeal, the State argues that California prisoners have no liberty interest in parole, and that if they do, the only due process protections available are a right to be heard

---

[8] Docket No. 22-1, pp. 110-14.

[9] Docket No. 22-1, p. 2.

and a right to be informed of the basis for the denial.[10]  That is, the State contends that there is no

due process right to have the result supported by sufficient evidence.  Because they are contrary

to binding Ninth Circuit law,[11] the State's arguments are without merit.  In its response, the State

identifies the factors, other than the underlying commitment offense, that the Board relied upon

in denying Watson parole.  The State also points to the evidence supporting those factors.

This Court must decide the case on the law as it exists at the time it renders is decision

and, if the law changes while the case is pending, this Court applies the new rule.[12]  Thus,

although it establishes a new rule, the holding in *Hayward* is controlling.  In this case, this Court

"need only decide whether the California judicial decision approving the [Board's] decision

rejecting parole was an 'unreasonable application' of the California 'some evidence'

requirement, or 'was based on an unreasonable determination of the facts in light of the

evidence.'"[13]  By its reference to § 2254(d), the Ninth Circuit implicitly, if not explicitly, directed

this Court to apply § 2254(d) to the decisions of the California Supreme Court, using the same

standards as are applied to the determination of the law as established by the United States

Supreme Court.

---

[10] *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 15 (1979).

[11] *See Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010); *Cooke*, 606 F.3d at 1213-14 (citing *Hayward*, 603 F.3d at 561-64); *Pearson*, 606 F.3d at 610-11 (same).

[12] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

[13] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[14]   The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[15]   When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[16]   The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[17]   Consequently, it appears that under the mandate of *Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state-court decisions.  This requirement is in tension with the holdings of the Supreme Court.  It is a fundamental precept of

---

[14] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[15] *Williams*, 529 U.S. at 412.

[16] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[17] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

dual federalism that the states possess primary authority for defining and enforcing the criminal law.[18]  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[19]  This principle applied to federal habeas review of state convictions long before AEDPA.[20]  A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[21]

At the time that the Board, the Ventura County Superior Court and the California Court of Appeal rendered their decisions, the California "some evidence" rule was embodied in *In re Rosenkrantz*[22] and *In re Dannenberg*.[23]  Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In re Lawrence*[24] and *In re Shaputis*.[25]

---

[18] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[19] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . .").

[20] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[21] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

[22] 59 P.3d 174 (Cal. 2002).

[23] 104 P.3d 783 (Cal. 2005).

[24] 190 P.3d 535 (Cal. 2008).

[25] 190 P.3d 573 (Cal. 2008).

In *Rosenkrantz*, the California Supreme Court held:

> [. . . .]  "Due process of law requires that [the Board's] decision be supported by some evidence in the record.  Only a modicum of evidence is required.  Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board].  [. . . .]  [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . .  It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.  As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[26]

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.)  Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.  [. . . .]
>
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ."  (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted.  Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)  [¶]  Therefore, a life term offense or any other offenses underlying an

---

[26] *Rosenkrantz*, 59 P.3d at 218.  Quoted with approval in *Shaputis*, 190 P.3d at 585.

indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[27]

In *Dannenberg* the California Supreme explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[28]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation.  Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[29]

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[30]  The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction

---

[27] *Rosenkrantz*, 59 P.3d at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

[28] *Dannenberg*, 104 P.3d at 795.

[29] *Id.* at 803.

[30] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

evidences."[31]  In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> [W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.[32]

This is the clarification upon which *Hayward*, *Pearson*, and *Cooke* rely, and it was the language in *Lawrence* to which this Court alluded in its Order at Docket No. 25.

This Court must, therefore, determine whether the decisions of the California courts upholding the Board's denial of parole complied with California law as expressed in *Lawrence* and *Shaputis*.  Because state court judgments carry a presumption of finality and legality, Watson has the burden of showing by a preponderance of the evidence that he merits habeas relief.[33] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[34]  This presumption applies to state

---

[31] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[32] 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

[33] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[34] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

trial courts and appellate courts alike.[35]  Both the subsidiary findings on the applicable factors

and the ultimate finding of some evidence constitute factual findings.[36]

Although the decisions of the Board, the Ventura County Superior Court, and the

California Court of Appeals predated the California Supreme Court decisions in *Lawrence* and

*Shaputis*, the decision of the California Supreme Court came after *Lawrence* and *Shaputis*.  In his

subsequent petition for habeas relief to the California Supreme Court, Watson presented the same

evidence and arguments that he had presented to the Ventura County Superior Court.[37]  Watson

also submitted the decision of the Ventura County Superior Court to the California Supreme

Court.  In its summary denial, the California Supreme Court is presumed to have decided the

case on the merits,[38] and adopted the reasoning of the Ventura County Superior Court.[39]  The

California Supreme Court is also presumed to have correctly applied California law.[40]  This

presumed adoption of the reasoning of the Ventura County Superior Court conclusively

establishes that the California Supreme Court was of the opinion that the Board's decision did

---

[35] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[36] *Cooke*, 606 F.3d at 1216.

[37] Under California's unique habeas procedure, a defendant who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal.  If denied relief by the court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court. This is considered the functional equivalent of the appeal process.  *See Carey v. Saffold*, 536 U.S. 214, 221-222 (2002).

[38] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[39] *Ylst*, 501 U.S. at 802-03.

[40] *See Estelle*, 502 U.S. at 67-68; *Walton,* 497 U.S. at 653; *Engle*, 456 U.S. at 119; *Bell,* 543 U.S. at 455.

not violate the California "some evidence" rule.  Further argument on that issue is, therefore, foreclosed.[41]

Even if this Court were to independently review the decision of the Ventura County Superior Court, the result would not change.  With respect to the underlying commitment offense, the applicable regulation provides:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>    (C) The victim was abused, defiled or mutilated during or after the offense.
>    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.[42]

The evidence clearly supports a finding that this case falls within the scope of (1)(A) and (1)(E), and possibly falls within the scope of (1)(D).  Under California law, a court neither re-weighs the evidence nor substitutes it's discretion for that of the Board.[43]  Judicial review of a decision denying parole is "extremely deferential."[44]  Thus, under *Rosenkrantz-Dannenberg*, this Court could not say that the decision of the Ventura County Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based

---

[41] *See Bradshaw*, 546 U.S. at 74, 76-78.

[42] Cal. Code. Regs., tit. 15, § 2402(c).

[43] This Court notes that, to a significant extent, the arguments of both Watson and his father in the *amicus* brief erroneously assume that this Court will re-weigh the evidence and substitute its judgment for that of the Board.

[44] *Rosenkrantz*, 59 P.3d at 210.

on an unreasonable determination of the facts in light of the evidence.  On the other hand, because *Hayward*, *Pearson*, and *Cooke* require that *Lawrence* and *Shaputis* be applied, this Court must look to determine whether there was some factor in addition to the underlying commitment offense to support denial of parole.

As noted above, in addition to the underlying commitment offense, the Board also relied upon Watson's need to better understand and cope with the underlying causes of, and acceptance of responsibility for the underlying crime.  In making this determination, the Board opined that Watson's version of the facts of the underlying crime, which the Board characterized as belatedly asserting self-defense, was at odds with the statements of the witnesses who testified at trial and the other evidence.

> **Presiding Commissioner Martinez:**  [. . . .]  Again, the inmate today presents himself in a sense of self-defense position where he, again, despite the evidence to witness' statements that contradict his story, and his version today. The Panel noted that we found his story to be somewhat self-serving in making himself be the victim.  The Panel doesn't believe that based on the facts of the case that he shot the two unarmed people, Mrs. Rodriguez and Mr. Salinas, as well as attempting to fire two rounds at Mrs. Gonzalez, who again did miss.  He was pointing (inaudible) two-year-old child.[45]

In his Supplemental Brief, Watson does not dispute that the evidence adduced at trial contradicts his statement.  Instead, Watson argues that his explanation is "reasonable," and that it should be accepted instead of the contrary evidence and testimony of the other witnesses.  This is a question of credibility, an issue committed solely to the discretion of the Board.  As noted above, this Court may not re-weigh the evidence, nor may this Court substitute it's judgment for that of the Board, or exercise its discretion in place of the Board's.  The lack of insight into and

---

[45] Docket No. 22-1, p. 106.

understanding of the causes of the underlying crime, standing alone, is a sufficient additional factor to support the finding of an unreasonable risk of danger to society and unsuitability for parole.[46]

The Board also had serious concerns about the psychological evaluation and Watson's failure to learn a vocation.  The Board rejected the psychological evaluation on the basis that it was unreliable, which justified disregarding it.  Rejection of favorable evidence cannot, however, constitute evidence of current dangerousness.[47]  Watson had a Bachelor's degree, a paralegal certification, and a restaurant hotel certification prior to his incarceration.[48]  How the fact he may not have pursued further vocational education while incarcerated is indicative of current dangerousness escapes logical explanation.

Thus, this Court cannot find that the decision of the Ventura County Superior Court was contrary to, or involved an unreasonable application of the California some evidence rule, or was based on an unreasonable determination of the facts in light of the evidence presented to that court.  Watson is not entitled to relief.

## V.  ORDER

**IT IS THEREFORE ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

---

[46] *See Shaputis*, 190 P.3d at 584-85.  This Court also notes that there is no authority for the proposition that the Board may not rely solely upon the commitment offense when, as here, the prisoner has not served his minimum term.

[47] *Cooke*, 606 F.3d at 1215.

[48] Docket No. 22-2, pp. 68-69.

**IT IS FURTHER ORDERED THAT** the Motion Requesting Permission to File This Amicus Brief at Docket No. 29 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[49]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[50]

The Clerk of the Court is to enter final judgment accordingly.

Dated:  November 12, 2010.

$\underline{\hspace{2cm}}$ /s/ James K. Singleton, Jr. $\underline{\hspace{2cm}}$
JAMES K. SINGLETON, JR.
United States District Judge

---

[49] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[50] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.